In re the MARRIAGE OF Marcella PRENDERGAST and Francis Prendergast.

Upon the Petition of Marcella Prendergast,
Petitioner-Appellant/Cross-Appellee,

and

Concerning Francis Prendergast,
Respondent-Appellee/Cross-Appellant.

No. 84–1167.

Court of Appeals of Iowa.

Sept. 24, 1985.

Griff Wodtke and Emil Trott of Barrett & Trott, Des Moines, for petitioner-appellant/cross-appellee.

Francine O'Brien Andersen of Andersen Law Offices, Audubon, for respondent-appellee/cross-appellant.

Considered by DONIELSON, P.J., and SCHLEGEL and SACKETT, JJ.

DONIELSON, Presiding Judge.

The parties' marriage was dissolved in February 1983. At the request of both parties, the district court later filed a supplemental ruling which attempted to clarify and expand the dissolution decree's division of property. Both parties have appealed from the supplemental ruling; they contend the district court erred in numerous ways in valuing and dividing the parties' extensive property.

The parties were married in 1945 and have a net worth of several million dollars. Their three children are all adults.

Their initial business was farming, but over the years they have also acquired real estate and have entered the business of real estate management and brokerage. They have also acquired other investments. Much of their wealth was held by a series of closely-held corporations and limited partnerships.

The parties' marriage was dissolved in February 1983. The dissolution decree attempted to make an essentially equal division of the parties' substantial property. Later in 1983, however, both parties filed applications asserting that the dissolution decree had overlooked certain assets and had not adequately addressed the complexi-

ties of some of the property. Both parties asked for a supplemental ruling. After a hearing, the trial court filed a supplemental ruling attempting to resolve the remaining issues relating to the division of property. Marcella has appealed, and Francis has cross-appealed from the supplemental ruling. The appeals raise many issues, but all involve the valuation and division of the parties' property.

## I. Modification Issues

**A. Scope of Review.** It is a well established rule that a property division in a dissolution decree like an ordinary judgment cannot be modified or vacated after it has become final in the absence of fraud, coercion, or other grounds on which ordinary judgments may be reviewed, modified, vacated, or set aside. *See In re Marriage of Knott,* 331 N.W.2d 135, 137 (Iowa 1983); *In re Marriage of Full,* 255 N.W.2d 153, 156 (Iowa 1977); *Knipfer v. Knipfer,* 259 Iowa 347, 353, 144 N.W.2d 140, 145 (1966). These grounds for modification are found in Iowa Rule of Civil Procedure 252. *Knott* at 136. Our review of rule 252 motions is on error, and the trial court's findings of fact are binding on us if supported by substantial evidence. *Hastings v. Espinosa,* 340 N.W.2d 603, 608 (Iowa Ct.App.1983).

A primary ground for asserting modification of a property division is through an alleged mutual mistake. Mistakes justifying modification have been found in instances where alleged mistakes were easily identifiable and indisputable such as where a mortgage or legal description of property was brought to the court's attention at the original proceeding and an erroneous figure or description was initially used. *See Cummings v. Cummings,* 248 Iowa 831, 82 N.W.2d 676 (1957) (court recognized mortgage existed but used $14,500 as the amount of debt instead of $19,000; the latter amount was adopted at the modification proceeding); *Full,* 255 N.W.2d at 157. An alleged mistake is not modifiable, however, if it is not capable of being easily identified or if it is not raised at the original hearing due to the oversight of one of

the parties. *Full,* 255 N.W.2d at 157–58, citing *Miller v. Miller,* 190 Neb. 816, 212 N.W.2d 646, 647 (1973) (The court was satisfied that the evidence presented in support of petitioner's motion to set aside the decree was readily available to her at the time of trial and a motion to vacate is not available to a party to supply deficiencies, if any, in the evidence adduced at trial.)

**B. Business Valuation.** It is important to note at the outset that Marcella is an experienced real estate broker who has been in the business for 27 years. Most of the modification issues involve disputes as to values of certain property which were not, but could have been, raised by Marcella at the original proceeding.

The parties, under the Waterloo Properties Limited Partnership, owned property named Greenridge Apartments (hereinafter "Waterloo Properties"). The issue on appeal focuses upon the valuation of this property. Francis introduced evidence that this property should be valued at $195,000. The trial court awarded this property, in its entirety, to Marcella. At the supplemental hearing, Marcella claimed a $75,000 debt existed on the property such that the trial court's property division was erroneous because she received less than she was entitled. Basically she complains that net worth should be used for valuation purposes instead of the amount invested on this modification appeal. While net worth is the usual method of valuation used in an original proceeding, Marcella did not object to using the amount invested at the original trial. To modify the initial determination, she must show a mistake existed and not merely that net worth would have been more appropriate. Marcella alleges a mistake was made in the valuation of Waterloo Properties and directs us to *Cummings v. Cummings,* 248 Iowa 831, 836–37, 82 N.W.2d 676, 679 (1957), as authority for her proposition. *Cummings* is inapplicable because the failure to deduct the $75,000 developer's fee from the amount invested was not a mistake made by the court. Rather, Marcella simply failed to raise this issue at the original hearing. The trial

court's decision is supported by substantial evidence.

■ A similar claim is made by Marcella regarding Greenwood Resources, an oil and gas limited partnership, which was awarded wholly to Marcella. She maintains the $30,000 valuation figure is incorrect because the court neglected to deduct a $9,000 liability. The court did not take the $9,000 liability into account because Marcella did not object to the $30,000 figure which was originally offered. For reasons consistent with the rationale of the finding as to Waterloo Properties, Marcella's claim is denied.

■ The trial court awarded Francis grain bins valued at $90,000. Marcella did not object to this award until June 1, 1984; then she claimed Francis got eight bins valued at $90,000, when only six bins were worth $90,000. Marcella claims it was a mistake to award Francis eight bins which were worth more than $90,000. While the number of bins which were included in the $90,000 award is disputed, Marcella is unable to adequately demonstrate that her failure to object to the $90,000 figure at the original hearing was a mistake. If the trial court explicitly awarded Francis six bins worth $90,000 and Marcella showed Francis received eight bins, then a mistake might have existed. This is not the case, however, because the court did not say it only awarded six bins to Francis. Although the property division may not be as advantageous as Marcella would like, she certainly had a sufficient opportunity to raise the valuation issues at trial.

The trial court further awarded Francis the jointly-owned stock of the parties in Prendergast Enterprises. The financial statement relied on by the court indicated the parties owned 1,619 acres of land. At the modification hearing, the court, realizing its obvious error, corrected the acreage to 1,519 and consequently directed Marcella to pay Francis the difference, which was $50,000. This is the type of mistake in a property division which can be properly modified. The trial court thought 1,619 was the correct acreage figure, however, 1,519 acres of identifiable land was indisputably shown to be the correct amount.

Marcella contends the 1,619 figure was not a mistake because the trial court did not use this 1,619 figure in arriving at the valuation of the stock. Although the court did not specifically mention 1,619 acres in its original decree, the court obviously relied on the erroneous figure because when the court became aware that the correct figure was 1,519 acres it changed the award. The mistake was apparently due to a typographical error which Francis was unaware of until after the trial. Marcella merely offers conjecture as to what she believes the court considered in valuing the stock in the original decree. The trial court's finding is supported by substantial evidence. Any other asserted errors in valuation of this stock are insufficient to constitute mutual mistakes.

■ **C. Benefits.** The trial court did not award alimony, but directed that Marcella should receive benefits under Francis' pension plan. Due to a change in federal laws, Marcella no longer qualifies for such benefits. *See* 10 U.S.C. § 1072(2)(f) (1984). She contends the parties were mutually mistaken as to the status of the law and she therefore should be awarded periodic property division payments of $300 monthly. We find that Marcella has not shown sufficient evidence of mistake to modify the property division. Furthermore, no alimony was awarded which means her request cannot be granted because it would constitute alimony. *See In re Marriage of Carlson*, 338 N.W.2d 136, 139 (Iowa 1983).

## II. Interpretation of Decree

**A. Scope of Review.** A divorce decree is susceptible to interpretation on the same basis as other written instruments, the determinative factor being intent of the court as gathered from the decree and other proper evidence. *Bowman v. Bennett*, 250 N.W.2d 47, 50 (Iowa 1977). Our review on an interpretation is de novo. *Bowman* at 49.

**B. Crops.** In addition to modification issues, several issues involve interpretation of the court's original decree. The first interpretation involves the trial court's order that each party receive equal shares of the unsold grain on hand. The trial court found the 19,200 bushels of soybeans were in the Clay Township storage bins; 10,000 bushels of such beans were owned by Prendergast Enterprises, Inc. The remaining 9,200 bushels were to be divided evenly between Francis and Marcella. Marcella introduced expert testimony at the supplemental hearing which indicated that a more accurate estimate of the bushels on hand was 19,543, instead of 19,200. Given this conflicting testimony, we agree with the trial court's conclusion that 19,200 bushels of beans were on hand. Secondly, Marcella contends that even if 19,200 bushels is the correct number, she should have received one-half of 19,200 bushels, instead of one-half of 9,200 bushels. She bases her claim upon the belief that the 10,000 bushels of beans which were owned by Prendergast Enterprises should have been considered as beans to be divided evenly between the parties.

██ Prendergast Enterprises is a separate legal entity from Francis and Marcella. Francis, Marcella, and their children were shareholders in this corporation. The stock the parties owned in Prendergast Enterprises was awarded, in its entirety, to Francis in the property settlement. To read the trial court's order literally and divide *all* grain on hand evenly would conflict with Prendergast Enterprises' status as a corporation that owns grain in which Marcella has no ownership rights. The trial court did not intend such a conflict and we uphold its determination that Marcella receive only 4,600 bushels of soybeans.

██ Another dispute involves Francis' alleged contemptible withholding of soybeans to Marcella. Francis explains his actions by indicating he did so only because Marcella was awarded more corn than he. Marcella had a contract to sell her soybeans at $6.20 a bushel, but was unable to sell the soybeans. Consequently, she bought the soybeans back at $7.26 a bushel; not including a $.10 a bushel penalty. She contends Francis' willful withholding of the beans caused her to lose $11,334. The trial court in resolving this dispute noted that Marcella had engaged in "similar conduct" regarding her relinquishment of the corn. The record suggests that both parties may have been less than completely cooperative at certain times in implementing the property division. We are unwilling to disturb the trial court's finding that Marcella is not entitled to any reimbursement for losses surrounding her sale of soybeans.

The final dispute involving crops concerns the previously mentioned corn division. Francis and Marcella had an ASCS loan for 81,146 bushels of jointly-owned corn. The court's decree required that the parties were to receive equal shares of the grain on hand on February 25, 1983. Marcella paid half of the loan; however, an unpaid balance of $17,373 on 5,337 bushels remains. Marcella believes Francis should pay this loan because she has already paid her share of the loan. On the contrary, Francis claims he did not receive half of the corn and should be relieved of his obligation to pay the remainder of the loan. The trial court agreed with Francis.

This issue is complicated by the fact that corn owned by the parties jointly and Prendergast Enterprises was commingled at the Clay Township bins.[1] Thus, it is difficult, if not impossible, to accurately determine which corn belongs to which party.

Marcella urges us not to look only at sealed corn under the ASCS loan, but all corn on hand in February of 1983. After thoroughly reviewing the record, we will include all corn and not just that which is covered by the ASCS loan. Nonetheless,

1. We can appreciate the need to commingle corn for practical reasons in a farming operation so this problem can be expected.

under this approach, we cannot find error in the trial court's ruling.

In 1981, the parties jointly owned 78,237 bushels of corn. The parties sold 25,000 bushels leaving a remainder of 53,237 bushels. This latter amount was then divided with Francis receiving 26,295 bushels and Marcella receiving 26,941 bushels. Thus, Marcella received an advantage of 646 bushels. Next, in 1982, 85,482 bushels were delivered to the Callendar elevator. Francis delivered 47,514 and Marcella delivered 37,968. Thus, Marcella received a 9,545 bushel advantage. The ASCS loan covered 81,146 bushels; Marcella paid off the loan on half of the 81,146 bushels and Francis repaid the loan on 35,236 bushels. The ASCS loan on 5,337 bushels remained.

The trial court found that Marcella owed 5,096 bushels to Francis because of her 646 and 9,545 bushel previous advantage. Similarly, Francis had 5,337 bushels on which a loan was due, but he refused to pay. Thus, the court found that Marcella's 5,096 extra bushel advantage would be cancelled out if she paid the ASCS loan on Francis' 5,337 bushels. We are convinced that equity will be served by preserving the status quo in this instance.

Francis further contends that Marcella should pay one-half of the prepaid storage fee he had to refund to the federal government when he sold this 1981 sealed corn. Given the complexities concerning the corn distribution, Marcella should not be required to pay Francis the sought after amount. Marcella's claim for soybean and corn overages is denied because this issue was not raised at the trial.

■ **C. Business.** The parties also ran a seed and chemical supply company called Hawkeye Farm Service and Realty. It was not disputed that Marcella was entitled to one-half of the $13,734 gross income. The dispute centers on whether a check for $6,095 from Francis to Marcella was intended as partial payment of the $6,867 Francis owed Marcella. Marcella claims the $6,095 check was for miscellaneous expenses, but she did not articulate what these expenses were. Notwithstanding the

considerable financial resources of Francis, we think it is unlikely that he gave Marcella $6,095 for personal use. On the same day Francis presented the check for $6,095, he delivered a check for $889 to Marcella. Thus, we find sufficient evidence to support the trial court's finding that Marcella is not entitled to relief on her request.

The trial court awarded Marcella the parties' real estate business called Hawkeye Realty. As mentioned, Francis was awarded the business called Hawkeye Farm Supply and Realty. Apparently Francis is only using the name Hawkeye Realty for his business, which seems to be causing confusion in the community as to who operates which business. If the facts are as Marcella states, the best course of action is to seek an injunction as the trial court directed.

### III. Cross-Appeal

Francis raises several aspects of the dissolution decree which he feels merit a different interpretation than the trial court adopted. First, he contends Marcella used $12,995 in funds from Prendergast Enterprises to purchase a van. Marcella did not repay this amount and Francis claims she should be directed to pay this debt owing to Prendergast Enterprises. We cannot agree with Francis' position. The trial court interpreted the decree as providing that Marcella would have been awarded the van regardless of how it was paid for. While the trial court apparently valued the Prendergast Enterprises stock based on the number of acres of farmland, the disputed $12,995 debt at issue here was not relevant to the trial court's valuation of the stock. Thus, Francis' claim is denied.

■ Second, the parties agreed in a joint posttrial request that if Mr. Piltingsrud, a mortgagor, defaulted on a previous real estate contract, Marcella was to assume Francis' equity. Subsequently, Marcella, through a transaction discussed later, obtained the rights under the Piltingsrud contract. Francis claims no "default" occurred and, as a result of the terms of the contract, that Marcella owes him $46,081.

Marcella takes the position that a default did take place.

The resolution of this issue turns upon whether Mr. Piltingsrud defaulted on the contract. Francis and Marcella entered into two separate real estate contracts for sale of two parcels to one Piltingsrud. The contract called for a down payment and an annual principal payment and interest at the Federal Land Bank rate. The dissolution decree approved a stipulation between Francis and Marcella wherein it was provided if Piltingsrud defaulted on the contracts Marcella was to buy Francis out under certain terms and conditions. Marcella received a quit claim deed from Piltingsrud after indirectly paying a $27,000 loan and $7,000 to $8,000 for the contract. The trial court determined that a default did not occur, that Marcella paid certain obligations of the Piltingsruds, and that Marcella took an assignment from the Piltingsruds.

We agree with the trial court's conclusion that the Piltingsruds did not default on the contract. However, Francis' claim for $46,081 must still be denied since this is a contract for the sale of land. This is not like an open account on which one would sue for the amount owed. The contract provides for a remedy should the buyer default in payment, and Francis' claim for unpaid interest should be denied.

The final issue, which is fitting given the tenor of this litigation, involves a claim by Marcella seeking a $282 reimbursement from Francis for a Blue Cross/Blue Shield insurance bill she paid. We hold that the trial court properly modified the decree in the supplemental ruling. The trial court's award of $282 is affirmed.

AFFIRMED.